CATON, Justice, delivered the opinion of the court: (1) At the December term, 1837, of the Peoria circuit court, the complainant filed his bill in chancery, alleging that he is a merchant in Boston; that in January, 1837, the defendant' Burlingame, in writing, and by his agent, William Gifford, Jr., applied to him to purchase a large amount of merchandise oh credit; that the complainant, at the time of the application, was a stranger to Burlin-game, his circumstances, and credit; that for the purpose of obtaining the credit, Burlingame presented to the complainant a written statement of his circumstances, which he represented to be correct, whereby he showed himself to be possessed of real and personal estate to the amount of $17,000, and that his indebtedness was about $7,300; that Gifford told the complainant he thought he might rely on said statement, and that he believed Burlingame to be honest; that relying on these statements and representations, the complainant sold and delivered to Gif-ford, as the agent of Burlingame, goods to the amount of [* 98] $5685.52, on a credit of six and twelve months; that the goods were received by Burlingame, in Peoria, in good condition, a part of which he had sold, and the balance were then in his possession, or in the custody of the law, as afterwards stated in the bill; that the said statements of Gifford were false and fraudulent, and that Burlingame was greatly insolvent, which he well knew; and so the complainant said that he had been cheated out of the said goods. That the other defendants attached many of the goods for debts due from Burlingame to them, before the purchase thereof, and that Bryant, the sheriff of Peoria county, had the goods in his possession, on the writs of attachment. These goods were named in schedule (A) annexed to the bill. The complainant avers that he would not have sold the goods on a credit, but for the fraudulent representations of Burlingame and Gifford; that complainant did not discover the fraud till after the goods had been received at Peoria, and that they have not been paid for. He avers that by reason of the fraud he has not been divested of the title to the goods, and that he fears they will be sold on the attachments, before he can get possession of them by legal process. He prays that the goods may be delivered up to him, and for an injunction. Bryant, the sheriff, H. Froth, and H. F. Froth, attaching creditors, except the issuing and levy of the attachment which they admit, answered and deny all knowledge of the matters stated in the bill. A replication was filed and proofs .taken. Tile deposition of John F. Ward, of Boston, states, that in January, 1837, one Gifford came to the counting room of the complainant, in Boston, and stated that he came to purchase goods for Burlingame. Witness was the complainant’s clerk, and heard the various conversations between the complainant and Gifford. Gifford wished to purchase goods for Burlingame on a credit; and the complainant sold him goods on a credit of six and twelve months, to the amount of about $5,000, on Burlingame’s responsibility alone. The goods were packed and sent to Burlingame, according to Gifford’s request. A letter was afterwards received from Burlingame, which is annexed. This letter speaks of the receipt of the goods and' invoices, and says that he, Burlingame, would send the notes by the next mail; prefers that the complainant should not draw on him for fear of protests; complains of hard times; but says he has arrangements made for paying the first note; speaks of the complainant’s forwarding more goods per New Orleans. The witness says he has no recollection that any representations were made by Gifford of Burlingame’s responsibility. He found among the complainant’s papers, a power of attorney made by Burlingame authorizing Gifford to do any and all business for him at the east. The deposition of Levi Bartlett states, that in January, [* 99] 1837, Burlingame bought goods of him in Boston, by his agent, Gifford, to about the sum of $583, on a credit of six months, which were charged to him, and forwarded to his address at Peoria. Gifford had a paper, purporting to be a power of attorney signed by Burlingame, authorizing him to purchase the goods. Gifford made no particular representations of Burlingame’s responsibility, but spoke of him in general terms, as a merchant of good standing. Gifford produced a letter of Dr. Bartlett of .Peoria, a brother of witness, which spoke of Burlingame as a merchant of good standing and credit. The deposition of W. Gifford, Jr., states, that two days after he came to Peoria, which was on the 7th of August, 1836, he went into the store of Burlingame, and on the next day was so badly burned that he was unable to attend to business for nearly two months. After that he was in the store, but unable to attend to business, till he left for Boston, on the 29th of November, 1836; that he returned on the 1st of April, 1837, and continued in'the store, as clerk, till the 10th of June following. He purchased of the complainant for Burlingame, drugs, etc., to the amount of about $6,000.' These goods were shipped to and received by Burlingame at Peoria, about the first of April, 183T. They were purchased on a credit of six and twelve months, and Burlingame’s notes given for the payment. He told the complainant he thought Burlingame was worth about $10,000, after his debts were paid. This opinion was founded on the statements of Burlingame, and a schedule which he made of his property and liabilities, which he made out at the request of witness. He made it out that witness might exhibit it as presenting a true statement of his affairs. This schedule was annexed to Gifford’s deposition. It was shown to the complainant, at the time of the purchase, and as Burlingame was a stranger-in Boston, witness thinks the complainant would not have trusted him, but for the representations above stated. Soon after the goods were received,. witness learned that Burlingame was insolvent, and in June, 1837, the attachments were issued. The goods taken on the attachments were those purchased of the complainant. At the time the schedule was made out, he thinks Burlingame’s collectable debts did not exceed $300 or $400. At that time he thinks the goods in Burlingame’s store were not worth more than $400, they having been damaged by fire and water. At that time Burlingame was owing much more than was shown by the schedule. He owed $1,500 to the bank, not stated in it. One of the lots was mortgaged for $1,000, which fact was not shown in the schedule. On his cross-examination, he stated that Burlingame, did not show him his title papers to the land, but he thinks the schedule was correct as to the land he owned, He was the agent of Burlingame, at the time he made the purchase, and believed him to be worth what he then stated; but he thinks [*100] Burlingame knew the schedule was incorrect. He does not know whether or not the lands were estimated too high in the schedule. As he was going among strangers, the schedule was made out to show to those of whom he should purchase. The bank debt accrued before the schedule was made out. The reason why he took on the schedule containing a statement that the goods in Burlingame’s store were worth $4,000, when in fact they were worth only $400, was because he had not been all over Burlingame’s premises, and did not know what goods were there. He went into the store, as clerk, on the 7th of August; rvas burned on the 8th ; six weeks after he was carried into the store chamber, and in three or four weeks after, with assistance, walked about the premises, till the 29th of November, when he went east. In the mean time he put up some medicines, but does not remember that he wrote any in the books, tie did not consider about the value of the goods, nor did he know where they were. Burlingame had a building in Avhich he said he had goods, into which witness had not been. He did not know what were in many of the bundles in the store ; some of them had the strings burned off, and were partly opened, and new papers, without marks, were put on, and he did not examine the labels before the fire, and nearly all of the packages were without labels, when he went east. He thinks now, haying examined them since, ihat the goods were not worth more than $100, as many were damaged by fire and water. He did not examine the goods before he went east, although he knew they were damaged, but not to what extent. Burlingame sold out of these goods all of the time witness was gone, and witness judged of the value of them after he returned. Burlingame did not show witness the amount of his demands before he went east; but in June, 1837, the books of account came into witness’s hands for collection, and he judged of their value from recent credits, and his own attempts to collect. Burlingame was engaged in other business besides selling drugs, and he might have had notes and other demands, that witness knew nothing-of., Witness thinks he stated before' Judge Hunt, that he had rendered himself liable with Burlingame to Henshaw, for the goods, but not that he had become surety. He cannot recollect that he stated in his testimony, in another cause, that he had become surety to Henshaw-for these goods, and that Henshaw would not sell them on Bur-lingame’s responsibility alone ; bat he thinks he said something like it. He said nothing, to Lewis Howell on the subject, as he recollects. On his re-examination, he said that he did not then think that he had rendered himself liable for the goods, while acting as Burlingame’s agent. [*101] The following schedule is annexed to Gifford’s deposition : “ Schedule. 880 acres land at $5, Lot with stable, $4,400 2,000 $6,400 Lot in ravine, “ on the prairie, 1.500 800 3,300 Lot at Wyoming, “ from Kennedy, 300 300 • 600 Debts due J. B. B. - - Goods, etc., 2.500 4,000 6,500 Sundries, horses, etc., 200 200 $17,000 Graham, Maybee & Go., New York, 81,489.64 Suydam & Reed “ H. Froth & Co., Philadelphia, 178.68 1,200.00 J. D. Davis & Co., Pittsburgh, 868.72 ■Wm. Wilson & Son, 460.00 T. S. & Tatum, St. Louis, 360.00 Joseph Charles, “ 800.00 Jones & Bacon, “ 450.00 Leland & Gale, Peoria, ... 450.00 G. C. Dana, “ ... 200.00 H. Stearns, “ - - - 200.00 Silvey Putnam, Ohio, - - - 1,200.00 $7,307.40.” The deposition of Jacob Gales states, that the 880 acre lot, in 1836, was only worth $2.50 per acre; the lot in the ravine was worth $600; the part of lot five in block six was worth $1,000. On cross examination he stated that at that time (1836), C. Leland estimated the 880 lot at $5 per acre. He knows of no land being sold at that time as high as estimated in the schedule, nor did he hear such prices asked. He estimated at cash prices. The deposition of Moses Pettingall, states, that he thinks the ravine half lot was worth $500 in 1836, and that the stable lot was • worth $1000; and that the lands in the Peoria gardens (meaning the prairie lot), was worth $50. On cross examination he stated, that in 1836 land proprietors were in the habit of valuing land much higher than he considered it to be worth. Burlingame was a very extravagant man in his calculations, and he may have believed that the prices set in the schedule were reasonable. The deposition of Lewis Howell states, that in 1837 W. Gif-ford, Jr., told witness that he could not get the goods on Burlin-game’s account, without his, Gifford’s, becoming personally responsible for them. On cross examination, he said that he thought Gifford told him that he made Burlingame known to the complainant, and represented him as responsible. On the final hearing of the cause, the court below dismissed the bill with costs, which is now assigned for [*102] error. The complainant by this proceeding seeks to s.et aside the’sale of these goods, and repossess himself of them, on the ground of fraud practiced by Burlingame in the purchase. As the only evidence of the alleged fraud is to be found in the testimony of Gifford, it becomes necessary to see whether that deposition is entitled to sufficient credence to authorize the court to rely upon it. I think it is not. He swears that he went into Burlingame’s store on the 7th of August, 1836, and on the 8th was so badly burned that he was confined to his room for about two months, and after he was able to leave his room he was about the store and premises, till the 29th of November, some seven or eight weeks, when he went to Boston, as the agent ef Burlingame, to purchase goods. He took a schedule of the effects and liabilities of Burlingame, which he swears he believed at the time to be correct, which showed Burlingame to be worth about $9,000 more than he owed, and which he showed to Henshaw, to induce him to sell the goods on a credit. He now swears that the goods which are valued in the schedule at $4,000, were in fact worth but $400, and the debts which are set down at $2,500, only amounted to $300 or $400 that were collectable, and yet this extraordinary contrast is sworn to by this witness, for the purpose of convicting Burlingame of fraud in making out the schedule ; and still he swears that he believed at the time that the schedule contained the truth! ' Now, it is to be believed, for a moment, that a man well acquainted with the value of goods, as Gifford must have been, from his business, could have been in and about the store of Burlingame, for nearly two months, and attending more or less to the business of the store, and have believed there were $4,000 worth of goods, when in fact they were worth but $400 ? But if we are obliged to adopt one of these opinions of the value of the goods, I think we can more safely rely upon the former, for it is apparent that his facilities in the fall of 1837, when he was in and about the store for several weeks, as a clerk of Burlingame, and attending to the business of the establishment, to some extent, at least, were much greater for making a just estimate of the value of the goods, than they could have been the next spring, after an absence of several months, during the whole of which time Bur-lingame had been selling out of the goods. Gifford does not pretend to have any means of judging howmany goods had been sold in the mean time, nor does he know that a large amount had not been disposed of in the other business, in which he says Burlingame was engaged. He does not tell us that the packages contained articles of less value than he had supposed, or that they were less in quantity. Indeed, when driven to extremity to explain this extraordinary change of opinion, he says that when the schedule was made out, Burlingame claimed to have goods in another [* 103] building, but he does not pretend that Burlingame had not such goods, nor that they were less in quantity or value than he claimed. There is nothing in the whole case tending to falsify that statement of Burlingame, or weakening the probability that he may have disposed of them in some way during the absence of Gifford ; and it is manifest if there were such goods, they ought to be taken into the account, in determining the truth of that schedule. But this witness, when it was necessary to justify his former estimate of the goods at $4,000, was willing enough to believe that Burlingame had those goods; yet when it becomes necessary to make him out insolvent, he seems just as willing to swear that the whole value of the goods was only $400, without pretending to know whether he had such goods or not, or how many had been sold or disposed of by Burlingame, in his other business, which Gifford says he carried on during his absence. Another reason which Gifford assigns for his being deceived in the value of these goods is, that many of the packages were not labelled, so that he was ignorant of their contents. But informing his opinion of their value, he must have supposed that they contained something, and probably such articles as constitute an assortment in a drug store; and he does not pretend that in this supposition he was deceived in the least. Had it turned out that the packages contained sawdust or something else of no value, it might indeed explain satisfactorily why he had been so grossly deceived; but nothing of this kind is pretended. And now to tell us, that in 1836, with the facilities which he then had for forming a correct opinion, and the motives which he had for knowing that that opinion was correct, he believed these goods to be worth $4,000, and then to tell us, after an absence of several months, during the whole of which time Burlingame had been disposing of these goods in various ways, and without pretending to know how many had' been thus disposed of, that he believes these same goods were at that time only worth a tenth part of that sum, and ask us to believe that both estimates were made from an honest conviction of their truth, is indeed too much for my credulity. But again he assigns as another reason for this extraordinary change of opinion as to the value of these goods, that many of the packages had been damaged by fire and water ; and yet it appears that he was not ignorant of this fact when he formed his first opinion, for he tells us that by reason of this same damage they were put in new envelopes. It seems to me we are forced to the conclusion, that if these goods, at the time the schedule was made out, were only worth $400, Gifford could not have believed that the schedule contained the truth; and if any fraud was practised on the complainant, lie knowingly and actively participated in it. But it may be said that it does not weaken the complainant’s equity, because two have been guilty of the fraud instead of one; and it would be well said, if we had sufficient evidence of the fact; but [* 104] in that case there would be a very good reason why we should not rely on the testimony of one of the fraudulent parties testifying as this witness does. There is another portion of this deposition which is entitled to particular remark, as it tends to show the loose manner, at least, in which this witness testifies, and the feeling by which he is influenced. In order to show the enormous extravagance of which Burlingame had been guilty in this schedule, the witness tells us that the debts which are set down in the schedule at f2,500 were only in fact worth $300 or $400, while he assures us that he knows nothing of the debts due to Burlingame, except such as were contained in some books of account which came into his hands for collection, in June, 1887 ; and even of these books he ■ does not pretend to give the nominal value of debt which they contain, while he admits that Burlingame, at the same time, may have had notes, and other evidences of-indebtedness, to an indefinite amount, of which he knew nothing; and this is the way that this witness makes out and swears that Burlingame was insolvent. I admit, that upon a first glance at this testimony, and without any attempt to sift and ascertain what it really does prove, it might /lead to the conclusion that Burlingame had represented himself to the complainant to be worth some $12,000 more than he really was, the very statement of which is calculated to hurry us away from a careful enquiry into the real merits of the testimony by which we are hastened to such a conclusion. The very enormity of the case which Gifford attempts to make out admonishes us of the necessity of looking carefully into his testimony, and upon such an examination, I think I may safely say,.if the whole case depended on the question whether Burlingame was insolvent at the time of the purchase, and that he knew it, a jury would not be warranted in finding such to be the fact upon this testimony. Even Gifford does not swear that Burlingame was insolvent at the time he made out the schedule; but says, “I learned soon after the arrival of the goods in Peoria, that he was insolvent.” How he learned this he does not tell us; for in answer to an en-quiry whether the lands in the schedule were valued too high, he says, “ I do not know whether that was a fair valuation or not.” And when called on for that purpose, the only reason he assigns for believing that Burlingame did not think himself worth as much as was represented in the schedule is, that Burlingame withheld from him knowledge of the bank debt of $1,500. What evidence he ever had of the existence of that debt, he has not informed us. In another part of his deposition he states that one of the lots mentioned in the schedule was encumbered for $1,000. I think we are authorized to infer that this was a portion of the $7,307, of indebtedness mentioned in the schedule, else when he complains that the knowledge of the bank debt was sup- [* 105] pressed, he would also have complained that this debt was not in the list given him. Gale and Pettingall have, in their depositions,, estimated the real estate at less than half the value that is placed on it in the schedule; yet it appears, from the same depositions, that other persons estimated the land, at that time, as high as Burlingame himself; for Gale swears that Leland, in 1836, estimated the 880 acre lot, which is much the largest item, at the same price at which it is set down in the schedule ; and Pettingall tells us, that at that time, land, proprietors were in the habit of valuing land much higher than he considered it worth. He also informs us, that Burlingame was a very extravagant man in his calculations, and may have believed that the prices set in the schedule were reasonable. Admitting tben, if it be desired, that in the estimation which Burlingame placed on this real estate, he exceeded its cash value by one half, yet it by no means follows that the value which he set upon it was more than he really’ believed it to be worth; but on the other hand, I think from the testimony of the complainant's own witnesses, we are bound to presume, if he was mistaken, he was honestly mistaken, in common with others ; and it is far from being sufficient to convict him of fraud, to prove that he was mistaken. But it may be said, that he could not have been mistaken in estimating the goods on hand at <14000, when they were only worth $400, and in setting down the debts due to him at $2500, when they were only worth $800 or $400. I’ would readily agree to this conclusion, if such were clearly proved to have been the facts ; but I have already given my reasons for believing that no reliance can be placed on these conclusions of Gifford. In addition to the palpable inconsistency in the deposition of this witness, there are other circumstances, which, taken in connection, tend to discredit his statements. He says, when lie made the purchase, he told Henshaw that Burlingame was worth $10,000, and showed him the schedule. But Ward, who was Henshaw’s clerk, at that time, says he was present at the various conversations between him and Gifford, and he recollects of no representations made by Gifford of Burlingame’s circumstances. Nor does'it appear that he made any particular representations of the kind to Bartlett, a merchant of Boston, of whom he also purchased goods, at the same time, and on the same account. I admit, that by this testimony, Gifford is only negatively and circumstantially contradicted ; and if these were the only circumstances of suspicion to be met with in the testimony of this witness, they would not of themselves be sufficient to discredit him ; yet when we find them associated with so many other suspicious circumstances, we cannot, with justice, pass them over unobserved. On his cross examination, he admits he may have testified, on a former trial, that Henshaw would not sell the [* 106] goods on Burlingame’s responsibility alone, or something like it; and Howell expressly swears, that in July, 1837, Gifford told him that he could not get the goods on Burlingame’s account, without his, Gifford's, becoming personally responsible for them. If he had ever sworn to anything like what he here admits lie may have sworn to, he must have done it understandingly; and it is totally irreconcilable to what he has here sworn to ; and if he stated the truth on the former trial, or if he told the truth to Howell, when he stated to him that he had become personally responsible for the goods, it may form some explanation for whatever anxiety may be manifested by this witness, that the sale may be vacated., and the goods returned. It is in vain to say that these declarations were made by Gifford under the supposition that he had rendered himself liable for the goods, for having represented Burlingame to be solvent, when he was nót; because the declarations themselves show an original and positive joint liability with Burlingame for the goods, and are entirely inT consistent with the supposition of a constructive liability ; for he said he could not get the goods on Burlingame’s responsibility, nor without his becoming personally responsible for them. On the whole, then, I feel constrained to say, as I have before stated, that the testimony of this witness is not entitled to that weight and influence which will warrant a court to render a decree whereby we should convict Burlingame of a corrupt and deliberate fraud — such as would render him liable to be punished criminally. But admitting that we should look upon the testimony of this witness, Gifford, with more charity and liberality, and give it all the influence that can in any respect be claimed for it, still I do not think that such a case of fraud is made out as would authorize this court to declare the' transaction void. I have looked into all of the cases on this subject, to which we - have access, and I find the rule clearly deducible from them to be that Avhere a person, who knows himself to be insolvent, by means of fraudulent pretences or representations, obtains possesr sion of goods under a pretence of purchase, with the intention not to pay for them, but with the design to cheat the vendor out of them, a court of chancery will set aside the sale, and order a return of the goods, if they have not passed into the hands of a bona fide purchaser ; or the vendor may bring replevin or trover for them. It is unnecessary to enter into a particular review of all of the cases on this subject, but a bare reference to some of the leading authorities will be sufficient. Chit, on Cont. 321; Durrell v. Haley, 1 Paige 492; Lupin v. Marn, 2 Paige 172; Lloyd v. Brewster, 4 Paige 541; Van Cliff v. Fleet, 15 Johns. 147; Allison v. Matthieu, 3 Johns. [* 107] 235; Rowley v. Bigelow, 12 Pick. 312; Parker v. Patrick, 5 T. R. 175. And I find it also laid down, whenever this branch of the subject is referred to, that in order to set aside a sale for fraud, such a case must be made out as would authorize a jury to convict the purchaser of obtaining the goods under false pretences. Lloyd v. Brewster, 4 Paige 541; Chit, on Cont. 321. And the only difficulty which I find is to ascertain precisely what acts of fraud must be proved, to make out such a case. The courts of New York have allowed less evidence of the fraudulent intent to prevail, both in civil and criminal cases, than the courts in any of the other states or Eiigland; but even there I have found no case in which the particular acts of fraud complained of have been given, where the case has been sustained upon evidence of the character here presented. In the case of Noble v. Adams, cited in Chitty on Contracts 321, we find this question distinctly alluded to. That was a case of trover, brought by the purchaser • for the goods bought, which had been stopped in transitu, and the defendants set up fraud in the sale, and the jury found a verdict for them. On a motion for a new trial, chief justice Gibbs says, “ The court is of opinion that a new trial ought to be granted in this case; because, without defining exactly what may or may not amount to such a fraud as would render the sale absolutely void, we are of opinion that the evidence, as it here stands, does not show any conduct on the part of the plaintiff sufficient to convince us that the transaction was void. It was proved that Owthwet’s bill (with which the goods were purchased), was nothing, and that he considered his own credit in England as nearly gone; that he went to Glasgow, intending to purchase goods there, with persons unacquainted with his credit, or with the character of his bills ; but by what means he prevailed on Cross & Co. to sell him the goods, is not in proof; and unless his representations amounted to the offence of obtaining goods under false pretences, we cannot take upon ourselves to say that the contract was absolutely void. Without, therefore, saying what proof the case may be capable of, seeing there is a strong presumption of fraud, we grant a new trial only on the ground that the proof, as it stands, is not sufficient to fix fraud to that extent on the plaintiff.” Here, although the plaintiff being irresponsible, bought goods of a stranger, and paid for them with a bill which he knew to be valueless, yet this was held, against the verdict of a jury, not to be sufficient evidence of fraud to vitiate the sale. It is a very common feature in cases of this sort, and one almost of controlling influence, that the goods fraudulently purchased were obtained for the express purpose of being levied upon by an execution or attachment of some favorite real or pretended creditor ; but. in this case there is no pretence of collusion between the purchaser and the attaching cred- [* 108] itors ; but if there is any collusion in the case, it will be found between the complainant and the witness Gifford. But admitting it to be established that Burlingame was insolvent to a very large amount, in the opinion of the witnesses, it by no means follows, that he did not himself believe that, with a continuance of prosperous times, a fortunate disposition of his property, and successful collection of his debts, he might pay off his liabilities, and leave his means still unexhausted; especially when we remember, what we know as a part of the financial history of the country, that at the time when this schedule is said to have been made, the most moderate were prone to extravagance, and hope became belief; and what now would be thought chimerical wore the appearance of probability. It appears, too, that in those extravagant times, Burlingame was called extravagant. These are considerations that would be rejected at once, it' we were examining the abstract question .of the real responsibility of Burlingame alone; yet, when we remember that the quo animo with which the purchase was made — whether he expected, or intended to pay for' the goods when he purchased them, or whether he intended to cheat the complainant out of them, constitutes the very gist of the alleged fraud — circumstances of this nature are entitled to great weight. In determining this question of intent,- it is proper we should take into consideration what transpired subsequently, as well as antecedently to the purchase. We find the goods directed and shipped to the known place of residence of the purchaser, and on their arrival, he put them into his store, and for several months disposes of them to his customers, in the usual course of business. Here is no secreting of the goods, or shuffling them into the hands of third persons; but, so far as we know, we find him conducting himself precisely as we should expect, had he hoped and intended, honestly and fairly, not only to pay for these goods, but to meet all his other liabilities; and we cannot say, if the times had continued as prosperous as when he made the purchase, and his creditors had extended him indulgence, that these hopes might not have been realized. In any aspect in which this case can be viewed, I think there is a total failure in proving that it was the design and intent, on the part of Burlingame, at the time he sent Gifford east, never to pay for the goods he might buy, which is indispensable to make out this case. Had such been his intent, we should certainly have seen a different disposition of these goods from that which has been proved. Should we establish a rule that would declare all sales void, where the purchaser does not disclose to the seller his real circumstances, many contracts, made with the most upright intentions, would be annulled for fraud. While a man is really struggling against adversity, with an honest intent to [*109] retrieve his fortunes, the law will not declare him incapable of purchasing goods on a credit, although he does not disclose to the vendor the extent of his embarrassments. In such a case, there is wanting that essential ingredient in fraud, a design never to pay. There is another reason why Burlingame could not be con-? victed of obtaining goods under fraudulent pretences, which is entitled to consideration in this case. To sustain such an indictment, it should appear that the means used to deceive and defraud, were not such that .a man of ordinary prudence would not have become the dupe of the deception. Admitting in this case that Burlingame was guilty of deception, Henshaw was guilty of credulity. It appears that he received the naked and unsupported representations of a stranger, residing more than a thousand miles distant, and resorting to no sort of means to ascertain the truth of his statements; but upon his mere naked word alone, and without a voucher, he trusted him to nearly §6000, and now, when he has discovered the error into which his unreasonable confidence has betrayed him, he calls upon a court of equity to interpose between him and his folly. When men so far forget their own interests, it is not the policy of the law to interfere in this extraordinary mariner, but it will leave the parties to their ordinary remedy. In whatever position we view this case, we are satisfied that the decree of the court below was proper, and it is therefore affirmed with costs. Lockwood and Semple, Justices, did not hear the argument.